## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PEOPLE FOR THE AMERICAN WAY )
FOUNDATION, )
 )
      Plaintiff, )
 )      Civil Action No. 06-00206 (ESH)
      v. )
 )
NATIONAL SECURITY AGENCY/CENTRAL )
SECURITY SERVICE, )
 )
      Defendant. )
_____ )

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff in this case, the People for the American Way Foundation, challenges the

decision of the National Security Agency ("NSA" or "the Agency") to withhold documents

responsive to its request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

Plaintiff's FOIA request seeks documents from NSA relating to the highly classified Terrorist

Surveillance Program ("TSP") which was authorized by the President of the United States after

the terrorist attacks of September 11, 2001, in order to detect and prevent another catastrophic

attack on the United States.  In light of the grave dangers to the national security that could result

if NSA is compelled to disclose information relating to the TSP, NSA has properly refused to

disclose information responsive to plaintiff's requests, and has otherwise responded properly

under FOIA.  NSA, accordingly, hereby moves for summary judgment pursuant to Federal Rule

of Civil Procedure 56.

The vast majority of plaintiff's requests (requests numbered 1-4, 6-7, and 9-11), seek the

disclosure of documents which relate to the activities and functions of the NSA; for example,

plaintiff seeks documents relating to the identity of targets of the TSP (item no. 1), the frequency with which the TSP has been employed (item nos. 2-4), internal reviews and audits of the operation of the TSP (item nos. 6-7), material provided to certain members of Congress in closed briefings relating to the TSP (item nos. 9-10), and checklists that may be used in order to determine the targets of the TSP (item no. 11). These materials are specifically exempted from disclosure by federal statute, including, in particular, Section 6 of the National Security Agency Act of 1959, codified at 50 U.S.C. § 402 note, through which Congress has explicitly recognized the dangers inherent in public disclosure of the highly sensitive intelligence activities of the NSA. Moreover, these documents contain information that is highly classified, and that, if disclosed, could reasonably be expected to cause exceptionally grave damage to the national security of the United States. Because information of this type is specifically exempted from disclosure by FOIA, see 5 U.S.C. §§ 552(b)(1) & (b)(3), NSA did not violate FOIA by declining to disclose the documents, and the Agency is entitled to summary judgment on these requests.

Several other of plaintiff's requests (requests numbered 12, 13, and 16) seek disclosure of documents concerning specific alleged targets of the TSP. NSA can neither confirm nor deny the existence of documents in response to these requests without compromising the concerns that animate FOIA's exemptions from disclosure, and specifically the exemptions set forth at 5 U.S.C. §§ 552(b)(1) and (b)(3). These responses, as a matter of law, are valid under FOIA.

Finally, NSA has adequately explained that it has no records responsive to certain requests made by plaintiff (requests numbered 5, 14, and 15), and has produced 106 pages of documents responsive to plaintiff's request numbered 8 with certain redactions which NSA has also adequately explained and which FOIA plainly permits. Because these responses are entirely proper under FOIA, NSA is entitled to the entry of summary judgment.

## BACKGROUND

1.  **Origin and Mission of the NSA**.  The National Security Agency ("NSA" or "the

Agency") was established by Presidential Directive in 1952 as a separately organized agency

within the Department of Defense.  Declaration of Louis F. Giles ("Giles Decl."), attached as Ex.

A, ¶ 2.  NSA has three functions: to collect, process, and disseminate signals intelligence

information for national foreign intelligence purposes; to conduct information security activities;

and to conduct operations security training for the U.S. Government.  Id.; see also Executive

Order 12333, 46 Fed. Reg. 59941, attached as Ex. B, § 1.12(b) (setting forth the responsibilities

of the NSA).[1]

Signals intelligence ("SIGINT") is one of NSA's primary functions.  Giles Decl. ¶ 3.

NSA's SIGINT mission include obtaining information from foreign electromagnetic signals and

intercepting communications necessary to the national defense, national security, or the conduct

of foreign affairs of the United States.  Id.  NSA provides, frequently on a rapid response basis,

reports derived from such information or data to national policy makers and the intelligence

community of the United States Government.  Id.

There are two primary reasons for gathering and analyzing intelligence information:  the

first, and most important, is to gain information required to direct U.S. resources as necessary to

counter external threats.  The second reason is to obtain information necessary to direct the

foreign policy of the United States.  Giles Decl. ¶ 5.  Information produced by SIGINT is relevant

to a wide range of issues, including military order of battle; threat warnings and readiness; arms

---

[1]  Executive Order 12333 has been twice amended, see 68 Fed. Reg. 4075 (Jan. 23, 2003); 69 Fed. Reg. 53593 (Aug. 27, 2004), to take account of the restructuring of the intelligence community that resulted from the creation of the Department of Homeland Security and the Office of the Director of National Intelligence.

proliferation; terrorism; and foreign aspects of international narcotics trafficking.  Id.

The SIGINT collection mission of NSA provides national policy makers and the intelligence community with highly reliable foreign intelligence information.  Giles Decl. ¶ 4. This information is often critical to the formulation of U.S. foreign policy and the support of U.S. military operations around the world.  Id. ¶ 5.  Foreign intelligence information produced by NSA as a result of its SIGINT mission is often unobtainable by other means.  Giles Decl. ¶ 5.

NSA's ability to produce foreign intelligence information depends upon its access to foreign and international electronic communications.  Giles Decl. ¶ 7.  Thus, NSA has developed a sophisticated worldwide SIGINT collection network to acquire these communications.  Id. ¶ 6. The technological infrastructure that supports NSA's foreign intelligence information collection has taken years to develop at a substantial cost and untold human effort.  Id.  It relies on sophisticated collection and processing technology that is designed to keep pace with challenging new technological developments.  Id. ¶ 4.

A fundamental tenet of NSA's communications collection process is that the identity of specific communications (referred to as "targets"), the degree of success in exploiting these targets, the vulnerability of particular foreign communications, and the extent of any cryptologic successes are matters that must be maintained in the strictest secrecy.  Giles Decl. ¶ 8.  This is because NSA's SIGINT technology is both expensive and fragile.  Id. ¶ 7; see also Declaration of Joseph B. ("NSA Decl.")[2], attached as Ex. C, ¶ 5.  Disclosure of the identities of targets, the degree of success or weakness in exploiting those targets, the vulnerabilities of particular foreign communications, and the extent of any cryptologic success would encourage countermeasures by

---

[2]  Although the substance of the declaration provided by the second NSA declarant may be placed on the public record, the identity of that declarant cannot be publicly revealed. See NSA Decl. n.1.

the targets of NSA's efforts.  Giles Decl. ¶ 8.  Public disclosure of either the capability to collect

specific communications or the substance of the information itself can easily alert targets to the

vulnerability of their communications.  Id. ¶ 7; see also NSA Decl. ¶ 5.  Thus, disclosure of even

a single communication has the potential to reveal the intelligence collection techniques that are

applied against targets around the world.  Giles Decl. ¶ 7.

Once alerted that NSA is targeting their communications, a target can easily frustrate

SIGINT collection by taking steps to evade detection, to manipulate the information that NSA

receives, or to implement other countermeasures aimed at undermining NSA's operations, such

as, for example, using different communications techniques or utilizing a different

communications link.  NSA Decl. ¶¶ 5, 13; see also Giles Decl. ¶ 7.  If a target is successful in

defeating an intercept operation, all of the intelligence from that source is lost until and unless

NSA can establish a new and equivalent exploitation of the target's signals.  Giles Decl. ¶ 8.  If a

source becomes unavailable, the military, national policymakers, and the intelligence community

must operate without the information such signals provided.  Giles Decl. ¶ 8.  These intelligence

losses are extremely harmful to the national security of the United States.  Id.; NSA Decl. ¶ 5.

**2.  The Terrorist Surveillance Program**.  Following the devastating attacks of

September 11, 2001, the President of the United States authorized the NSA to intercept

international communications into and out of the United States of persons linked to al Qaeda or

related terrorist organizations (hereinafter, the "Terrorist Surveillance Program," or "TSP").

NSA Decl. ¶ 3.  The TSP is a SIGINT program critical to the national security of the United

States.  Id. ¶ 4.  It is a targeted and focused program intended to help "connect the dots" between

known and potential terrorists and their affiliates.  Id. ¶ 3.

In order to intercept a communication under the TSP, one party to the communication

must be located outside the United States, and there must be a reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda.  NSA Decl. ¶ 3.  Thus, the TSP is an "early warning system" established in order to detect and prevent another catastrophic attack on the United Sates.  NSA Decl. ¶ 3.

The President publicly acknowledged the existence of the TSP on December 17, 2005. NSA Decl. ¶ 4.  As the President has made clear, however, details about the TSP remain highly classified and subject to special access restrictions under the criteria set forth in Executive Order 12958, 60 Fed. Reg. 19825 (Apr. 17, 1995), as amended by Executive Order 13292, 68 Fed. Reg. 15315 (Mar. 25, 2003).[3]  Id.  Unauthorized disclosure of information regarding the TSP can be expected to cause exceptionally grave damage to the national security of the United States, and thus, pursuant to the criteria outlined in Executive Order 12958, as amended, information related to the TSP is classified TOP SECRET.  NSA Decl. ¶ 4.  Moreover, because information related to the TSP involves or derives from particularly sensitive intelligence sources and methods, it is subject to the special access and handling procedures reserved for Sensitive Compartmented Information ("SCI").  NSA Decl. ¶ 4.[4]

Loss of accurate intelligence information derived from the TSP could result in the catastrophic failure of the early warning system that the President has established to detect and prevent the next terrorist attack.  NSA Decl. ¶ 5.

---

[3]  All citations herein to Executive Order 12958 are to the Order as amended by Executive Order 13292.  A copy of the amended Executive Order is attached as Ex. D.

[4]  "Access to Sensitive Compartmented Information ("SCI") requires clearance beyond the 'Top Secret' level.  SCI is classified information that is required to be handled exclusively within formal access control systems established by the Director of [National] Intelligence." Guillot v. Garrett, 970 F.2d 1320, 1322 n. 1 (4th Cir. 1992).

**3.  The Plaintiff's FOIA Request**.   On December 29, 2005, plaintiff submitted a FOIA request to NSA, seeking information regarding the TSP.  Giles Decl., Ex. 1.  Plaintiff sought information in 16 categories.  Id.  In response to plaintiff's FOIA request, NSA undertook a search for those categories of documents which were most likely to contain information responsive to plaintiff's specific requests.  NSA Decl. ¶ 8; Giles Decl. ¶¶ 12-13.  On February 14, 2006, NSA responded to plaintiff's FOIA request.  Giles Decl. ¶ 9 & Ex. 2.  NSA produced 106 pages responsive to plaintiff's request numbered 8 with certain redactions; advised that it had no records responsive to plaintiff's requests numbered 5, 14, and 15; explained that it could not confirm or deny the existence of records responsive to plaintiff's requests numbered 12, 13, and 16; and withheld information responsive to plaintiff's requests numbered 1-4, 6-7, and 9-11 pursuant to the exemption provisions of FOIA, 5 U.S.C. § 552(b).  See Giles Decl. Ex. 2.

## ARGUMENT

### NSA IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FOIA CLAIMS

The FOIA's "basic purpose" reflects a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language."  John Doe Agency v. John Doe Corp., 493 U.S. 146, 149 (1989).  "Congress recognized, however, that public disclosure is not always in the public interest."  Central Intelligence Agency v. Sims, 471 U.S. 159, 167 (1985).  The FOIA is designed to achieve a "workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy."  John Doe, 493 U.S. at 152 (quoting H.R. Rep. No. 1497, 89th Cong., 2 Sess. 6 (1966), reprinted in 1966 U.S.C.C.A.N. 2416, 2423); see also American Civil Liberties Union v. U.S. Dept. of Justice ("ACLU I"), 265 F. Supp. 2d 20, 27 (D.D.C. 2003) (Huvelle, J.) ("it must be recognized that FOIA represents a carefully

considered balance between the right of the public to know what their government is up to and the often compelling interest that the government maintains in keeping certain information private, whether to protect particular individuals or the national interest as a whole").

To that end, FOIA mandates disclosure of government records unless the requested information falls within one of nine enumerated exceptions, see 5 U.S.C. § 552(b).  "A district court only has jurisdiction to compel an agency to disclose improperly withheld agency records," i.e., records that do "not fall within an exemption."  Minier v. Central Intelligence Agency, 88 F.3d 796, 803 (9th Cir. 1996) (emphasis by the court); see also 5 U.S.C. § 552(a)(4)(B) (providing jurisdiction only to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld. . . ."); Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 150 (1980) ("Under 5 U.S.C. § 552(a)(4)(B)[,] federal jurisdiction is dependent upon a showing that an agency has (1) 'improperly' (2) 'withheld' (3) 'agency records.'").  Despite the "liberal congressional purpose" of FOIA, the statutory exemptions must be given "meaningful reach and application."  John Doe, 493 U.S. at 152. "Requiring an agency to disclose exempt information is not authorized. . . ."  Minier, 88 F.3d at 800 (quoting Spurlock v. Fed. Bureau of Investigation, 69 F.3d 1010, 1016 (9th Cir. 1995)).

The government bears the burden of proving that the withheld information falls within the exemptions it invokes.  5 U.S.C. § 552(a)(4)(b).  Summary judgment should be granted if the movant has shown, when the facts are viewed in the light most favorable to the nonmovant, that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Greene v. Dalton, 164 F.3d 671, 674 (D.C. Cir. 1999).  A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set

forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288 (1968)).  In a FOIA case, the court may award summary judgment to an agency on the basis of information provided in affidavits or declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir.1981).

In evaluating the applicability of FOIA exemptions for purposes of deciding this summary judgment motion, the Court must be mindful that the information sought by plaintiff "implicat[es] national security, a uniquely executive purview." Center for Nat'l Security Studies v. U.S. Dept. of Justice, 331 F.3d 918, 926 (D.C. Cir. 2003), cert. denied, 540 U.S. 1104 (2004). Both the Supreme Court and the Court of Appeals have specifically recognized the "propriety of deference to the executive in the context of FOIA claims which implicate national security." Id. at 927-89 (citing, inter alia, Sims, supra; McGehee v. Casey, 718 F.2d 1137 (D.C. Cir. 1983)); see also Center for Nat'l Security Studies, 331 F.3d at 927 ("terrorism or other special circumstances" might warrant "heightened deference to the judgments of the political branches") (citing Zadvydas v. Davis, 533 U.S. 678, 696 (2001)).

Indeed, courts have routinely and repeatedly emphasized that "weigh[ing] the variety of subtle and complex factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the [nation's] intelligence-gathering process" is a task best left to the Executive Branch and not attempted by the judiciary. Sims, 471 U.S. at 180; see also Center for Nat'l Security Studies, 331 F.3d at 928 ("the judiciary is in an extremely poor

position to second-guess the executive's judgment in [the] area of national security"); Halperin v.

Central Intelligence Agency, 629 F.2d 144, 148 (D.C. Cir. 1980) ("Judges . . . lack the expertise

necessary to second-guess [] agency opinions in the typical national security FOIA case").  Thus,

courts have "consistently deferred to executive affidavits predicting harm to national security,

and have found it unwise to undertake searching judicial review."  Center for Nat'l Security

Studies, 331 F.3d at 927.  Instead, "[a]t least in the national security context, the reviewing court

must give 'substantial weight'" to an agency's declarations.  ACLU I, 265 F. Supp. 2d at 27

(quoting King v. Dept. of Justice, 830 F.2d 210, 217 (D.C. Cir. 1987)).

Given these standards of review, as the discussion below and the accompanying

declarations demonstrate, all of the information withheld by the NSA here plainly falls within

exemptions to FOIA's disclosure requirements.   NSA is thus entitled to summary judgment.

## I. NSA PROPERLY WITHHELD DOCUMENTS RESPONSIVE TO PLAINTIFF'S REQUESTS NUMBERED 1-4, 6-7, AND 9-11 PURSUANT TO EXEMPTION THREE.

Much of the information sought by plaintiff's requests was properly withheld by NSA

pursuant to Exemption Three of FOIA.  Exemption Three, which is set forth at 5 U.S.C.

§ 552(b)(3), is intended to protect information from disclosure under FOIA that Congress has

separately determined warrants special protection.  Thus, FOIA "does not apply to matters that

are – . . . specifically exempted from disclosure by statute . . . provided that the statute (A)

requires that matters be withheld from the public in such a manner as to leave no discretion on

the issue, and (B) establishes particular criteria for withholding or refers to particular types of

matters to be withheld."  Id.  In examining an Exemption Three claim, a court must determine

first whether the claimed statute is a statute of exemption under FOIA, and second whether the

withheld material satisfies the criteria of the exemption statute.  See Sims, 471 U.S. at 167;

Fitzgibbon v. Central Intelligence Agency, 911 F.2d 755, 761 (D.C. Cir. 1990).

Evaluating whether documents are properly withheld under Exemption Three presents considerations "distinct and apart from the other eight exemptions."  Fitzgibbon, 911 F.2d at 761 (quoting Ass'n of Retired R.R. Workers v. U.S. R.R. Retirement Bd., 830 F.2d 331, 336 (D.C. Cir. 1987)).  When Congress has enacted statutes that particularly identify certain categories of information that are exempt from public disclosure notwithstanding the requirements of FOIA, Congress makes "manifest" its intent to require the withholding of documents falling within the terms of those statutes.  Fitzgibbon, 911 F.2d at 761; see also id. at 764 ("exemption statutes were congressionally designed to shield processes at the very core of the intelligence agencies – intelligence-collection and intelligence-source evaluation").  Thus, as the Court of Appeals has explained, "'Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage.'"  Id. at 761-62 (quoting Assoc. of Retired R.R. Workers, 830 F.2d at 336, and Goland v. Central Intelligence Agency, 607 F.2d 339, 350 (D.C. Cir. 1978)).

### A.    Applicable Exemption Three Statutes.

Several protective statutes encompass the documents sought by plaintiff, and thus preclude the disclosure of those documents under FOIA Exemption Three.  Foremost among them is Section 6 of the National Security Agency Act of 1959, Pub. L. No. 86-36, § 6, 73 Stat. 63, 64, codified at 50 U.S.C. § 402 note, which provides:

> [N]othing in this Act or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, of any information with respect to the activities thereof, or of the names, titles, salaries, or number of persons employed by such agency.

Id.  It is well-established that Section 6 "is a statute qualifying under Exemption 3."  The

Founding Church of Scientology of Washington, D.C., Inc. v. Nat'l Security Agency, 610 F.2d 824, 828 (D.C. Cir. 1979); accord Hayden v. Nat'l Security Agency, 608 F.2d 1381, 1389 (D.C. Cir. 1979).  Section 6 reflects a "congressional judgment that in order to preserve national security, information elucidating the subjects specified ought to be safe from forced exposure." Church of Scientology, 610 F.2d at 828.  In enacting Section 6, Congress was "fully aware of the 'unique and sensitive' activities of the [NSA] which require 'extreme security measures.'" Hayden, 608 F.2d at 1390 (citing legislative history).  Thus, as the Court of Appeals has held, "[t]he protection afforded by section 6 is, by its very terms, absolute.  If a document is covered by section 6, NSA is entitled to withhold it. . . ."  Linder v. Nat'l Security Agency, 94 F.3d 693, 698 (D.C. Cir. 1996).

The second applicable statute is Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638 (Dec. 17, 2004), codified at 50 U.S.C. § 403-1(i)(1).  This statute requires the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure."[5]  It is "settled" that this statute falls within Exemption Three.  Gardels v. Central Intelligence Agency, 699 F.2d 1100, 1103 (D.C. Cir. 1982) (discussing predecessor statute applicable to Central Intelligence Agency ("CIA"), which provided that "the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure"); accord Sims, 471

---

[5]  The authority to protect intelligence sources and methods from disclosure is rooted in the "practical necessities of modern intelligence gathering," Fitzgibbon, 911 F.2d at 760, and has been described by the Supreme Court as both "sweeping," Sims, 471 U.S. at 169, and "wide-ranging."  Snepp v. United States, 444 U.S. 507, 509 (1980).  Sources and methods constitute "the heart of all intelligence operations," Sims, 471 U.S. at 167, and "[i]t is the responsibility of the [intelligence community], not that of the judiciary to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the . . . intelligence-gathering process."  Id. at 180.

U.S. at 167-68, 193 (1985); see also Fitzgibbon, 911 F.2d at 761 ("There is thus no doubt that [the predecessor CIA statute] is a proper exemption statute under exemption 3").[6] "As one of the member agencies of the intelligence community, NSA is required" by this section to protect intelligence sources and methods.  See Larson v. Dept. of State, 2005 WL 3276303, *19 (D.D.C. 2005), appeal docketed as Case No. 06-5112 (D.C. Cir.).

The third applicable statute is 18 U.S.C. § 798.  This statute prohibits, on pain of criminal penalty, the disclosure of various kinds of classified information, including information "concerning the communications intelligence activities of the United States."  Id.  Specifically, 18 U.S.C. § 798(a) provides, in pertinent part, that:

> Whoever knowingly and willfully communicates, furnishes, transmits or otherwise makes available to an unauthorized person, or publishes, or uses in any manner prejudicial to the safety or interest of the United States . . . any classified information . . . (3) concerning the communications intelligence activities of the United States . . . shall be fined under this title or imprisoned for not more than ten years, or both.

Id.  The term "communications intelligence" means "all procedures and methods used in the interception of communications and the obtaining of information from such communications by other than the intended recipients."  Id. § 798(b).  This statute clearly identifies matters to be withheld from the public and refers to particular types of matters to be withheld.  See 5 U.S.C. § 552(b)(3).  Thus, this statute qualifies as an Exemption Three statute under FOIA.  See Florida Immigrant Advocacy Ctr. v. Nat'l Security Agency, 380 F. Supp. 2d 1332, 1340 (S.D. Fla. 2005) ("Other exempting statutes include . . . 18 U.S.C. § 798"); Winter v. Nat'l Security Agency, 569 F. Supp. 545 (S.D. Cal. 1983) (18 U.S.C. § 798 is a "statute[] within Exemption 3").

_____

[6]  The predecessor statute was superceded by enactment of the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638 (Dec. 17, 2004), which shifted the responsibility for protecting intelligence sources and methods from the Director of Central Intelligence to the Director of National Intelligence.

**B.      NSA's Withholdings Fall Within the Scope of Exemption Three.**

In this case, all of the documents withheld by NSA fall into two categories of information that are squarely within the scope of the Exemption Three statutes that NSA has invoked, and, particularly, within the scope of Section 6 of the National Security Agency Act of 1959.[7]  First, NSA has withheld information regarding the functioning of the TSP, including (i)  informational briefing records, which "describe in detail the operational process used by NSA to carry out the TSP," NSA Decl. ¶ 9; (ii) checklists, which "set forth the criteria used to determine which individuals will be subject to surveillance under the TSP," NSA Decl. ¶ 16; and (iii) audits/internal reviews, which describe "the operation of the program, and provid[e] recommendations and suggestions for the effective operation" of the TSP.  NSA Decl. ¶ 18.  All of these documents contain information that describes the process by which intelligence information is collected under the TSP and thus falls squarely within the scope of Section 6, which requires the withholding of information related to "any function of the National Security Agency, or any information with respect to the activities thereof."  50 U.S.C. § 402 note. See Hayden, 608 F.2d at 1389 (finding the "plain wording" of the statute "conclusive").

As the Court of Appeals has squarely held, information which relates to SIGINT collection – such as the TSP-related information at issue in this case – is exempt from disclosure under Exemption Three.  See Linder, 94 F.3d at 696 ("There can be no doubt that the disclosure of [information related to SIGINT collection] would reveal information concerning the activities of the agency"); Hayden, 608 F.2d at 1389 ("signals intelligence is one of the NSA's primary

_____

    [7]  See Hayden, 608 F.2d at 1389 n. 44 (finding that Section 6 of the National Security Agency Act of 1959, Pub. L. No. 86-36, granted "the broadest exemption of the three statutes" and thus, was the only exemption statute that required consideration); accord Florida Immigrant Advocacy Ctr., 380 F. Supp. 2d at 1340.

functions"; and the release of information related to SIGINT collection would "disclose information with respect to [NSA] activities, since an intercepted communication concerns an NSA activity"); see also Larson, 2005 WL 3276303, at *19 (granting summary judgment to NSA on the basis of Exemption Three because "all of the material withheld . . . consists of information related to the activities, or core mission of NSA, to wit: intelligence gathering based on electromagnetic signals").

NSA has also withheld documents relating to the substantive collection of intelligence pursuant to the TSP, as well as the actual information collected. In particular, NSA has withheld information relating to the individuals that are subject to surveillance under the program, the frequency of such surveillance, and the criteria used to identify persons for surveillance. The disclosure of this information – which would reveal the targets of surveillance, see NSA Decl. ¶¶ 9-14, 16-17 – concerns "intelligence sources and methods" and thus falls squarely within the scope of Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638 (Dec. 17, 2004), codified at 50 U.S.C. § 403-1(i)(1). See NSA Decl. ¶¶ 15, 17; see Fitzgibbon, 911 F.2d at 762 (affirming agency decision to withhold information "relat[ing] to intelligence sources and methods"); Linder, 94 F.3d at 696 (upholding withholding of SIGINT collection information because "it seems obvious" that "disclosure could reveal information about NSA's capabilities and techniques that could be used by foreign governments to the detriment of U.S. national security interests"); see also Sims, 472 U.S. at 175 ("forced disclosure of the identities of its intelligence sources could well have a devastating impact on the [CIA]'s ability to carry out its mission").

All of the information withheld by NSA, moreover, concerns "the communications intelligence activities of the United States," 18 U.S.C. § 798(a), i.e., it concerns "procedures and

methods used in the interception of communications and the obtaining of information from such communications by other than the intended recipients," id. § 798(b), and is currently and properly classified.  NSA Decl. ¶¶ 10-14, 16-19, see also Giles Decl. ¶ 15; see also infra at pp. 19-27. This information, accordingly, cannot be disclosed pursuant to 18 U.S.C. § 798.

It is well-established that when relying on Exemption Three as the basis for withholding, NSA is "not required to provide any information as to the particular security threats posed by the release of the documents. . . . '[a] specific showing of potential harm to national security . . . is irrelevant to the language of [section 6].  Congress has already decided that disclosure of NSA activities is potentially harmful.'"  Linder, 94 F.3d at 696 (quoting Hayden, 608 F.2d at 1390). Nonetheless, the accompanying NSA declarations plainly demonstrate the serious consequences to the national security of the United States that would result from the disclosure of the information plaintiff seeks.  See NSA Decl. ¶¶ 10-20; see also infra pp. 19-27 (discussing the exceptionally grave harm to national security that would result from the disclosure of information related to the TSP which has been designated TOP SECRET-SCI under the terms of Executive Order 12958, as amended).  Congress's determination that the information such as that at issue in this case should not be made public, see 50 U.S.C. § 402 note, is strongly supported by the specific dangers NSA has identified that would result from such disclosure.

Finally, NSA is not required to submit document indices for materials withheld under Exemption Three because an index of the withheld documents, such as that suggested in Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), could "cause the very harm that section 6 was intended to prevent."  Linder, 94 F.3d at 697.  Thus, as the Hayden Court explained:

> In most . . . cases, a public Vaughn itemization does not compromise secrecy, because the contents of the requested documents are not thereby disclosed, and it is only the substantive content which is allegedly exempt from disclosure.  But with respect to NSA's signals intelligence operations, the sensitive material

> comprises <u>more</u> than just the substantive content of messages. Harm could follow
> from the disclosure of any material that might help identify the communications
> intercepted by NSA.

608 F.2d at 1384-85 (emphasis in original). The ordinary details provided in document indices

pursuant to <u>Vaughn</u>, <u>supra</u> – such as the dates documents were created, the authors, the subjects,

or the volume – cannot be disclosed by NSA without making public critical information about

when monitoring occurs, of whom, and how often. <u>See</u> <u>Campbell v. U.S. Dept. of Justice</u>, 164

F.3d 20, 31 (D.C. Cir. 1998) ("in special circumstances, such as those surrounding the

intelligence mission of the National Security Agency, . . . even minimal detail can itself

constitute sensitive information"). As the declarations provided by the NSA fully establish, such

disclosures compromise national security. <u>See</u> Giles Decl. ¶ 15; NSA Decl. ¶¶ 10-20.

     In sum, because the information withheld by NSA in this case falls within the plain

language of Section 6, 50 U.S.C. § 402 note, consists of information regarding intelligence

sources and methods which must be protected under Section 102A(i)(1) of the Intelligence

Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-1(i)(1), and is classified

information that cannot be disclosed without violating 18 U.S.C. § 798, NSA has properly relied

on Exemption Three as a basis for withholding information responsive to the plaintiff's FOIA

request. NSA is entitled to summary judgment on this ground.

## II.  NSA PROPERLY WITHHELD MATERIAL RESPONSIVE TO PLAINTIFF'S REQUESTS NUMBERED 1-4, 6-7, AND 9-11 PURSUANT TO FOIA EXEMPTION ONE.

     The information withheld by NSA pursuant to Exemption Three is also properly withheld

by NSA pursuant to Exemption One of FOIA.

### A.  Standards Governing Exemption One.

Exemption One protects records that are: (1) specifically authorized under criteria

established by an Executive Order to be kept secret in the interest of national defense or foreign

policy, and (2) are in fact properly classified pursuant to Executive Order.  <u>See</u> 5 U.S.C. § 552

(b)(1).  Exemption One thus "establishes a specific exemption for defense and foreign policy

secrets, and delegates to the President the power to establish the scope of that exemption by

executive order."  <u>Military Audit Project</u>, 656 F.2d at 737.

　　　　Section 1.2(a)(4) of Executive Order 12958, as amended, states that an agency may

classify information that fits into one or more of the Executive Order's categories for

classification when the appropriate classification authority "determines that the unauthorized

disclosure of the information reasonably could be expected to result in damage to the national

security."  68 Fed. Reg. 15315, 15315 (March 25, 2003).  In order to properly invoke Exemption

One, the agency must provide "detailed and specific" information demonstrating both "why the

material has been kept secret and why such secrecy is allowed by the terms of an existing

executive order."  <u>ACLU I</u>, 265 F. Supp. 2d at 27.

　　　　An agency's burden in this regard is "not especially onerous."  <u>ACLU I</u>, 265 F. Supp. 2d

at 29.  The issue for the Court is whether "on the whole record, the Agency's judgment

objectively survives the test of reasonableness, good faith, specificity and plausibility in the field

of foreign intelligence in which [the agency] is expert and has been given by Congress a special

role."  <u>Gardels</u>, 689 F.2d at 1105.  Although the agency bears the burden of proving its claim for

exemption, <u>see</u> 5 U.S.C. § 552(a)(4)(B), because agencies have "unique insights" into the

adverse effects that might result from public disclosure of classified information, the courts must

accord "substantial weight" to an agency's affidavits justifying classification.  <u>Miller v. Casey</u>,

730 F.2d 773, 776 (D.C. Cir. 1984); <u>Military Audit Project</u>, 656 F.2d at 738.

　　　　Thus, to carry its burden of demonstrating the propriety of its decisions supporting its

Exemption One position, NSA must simply demonstrate a "logical connection between the information and the claimed exemption." ACLU I, 265 F. Supp. 2d at 29-30. In reviewing the claims made by the NSA, the Court "is not to conduct a detailed inquiry to decide whether it agrees with the agency's opinions." Halperin, 629 F.2d at 148; see Weissman v. Central Intelligence Agency, 565 F.2d 692, 697 (D.C. Cir. 1997) (recognizing that "[f]ew judges have the skill or experience to weigh the repercussions of disclosure of intelligence information"). To do so would violate the principle of according substantial weight to the expert opinion of the agency. See Miller, 730 F.2d at 776; Military Audit Project, 656 F.2d at 738. Instead, the Court must "take seriously the government's predictions about the security implications of releasing particular information to the public . . . ," ACLU I, 265 F. Supp. 2d at 28, and "recognize that the executive branch departments responsive for national security and national defense have unique insights and special expertise concerning the kind of disclosures that may be harmful." Id. at 27 (citing Krikorian v. Dept. of State, 984 F.2d 461, 464 (D.C. Cir. 1993); Salisbury v. United States, 690 F.2d 966, 970 (D.C. Cir. 1982); and Military Audit Project, 656 F.2d at 738).

**B.    NSA's Withholdings Fall Within the Scope of Exemption One.**

All of the information withheld by NSA here, if disclosed, has the potential to substantially compromise the national security of the United States. See NSA Decl. ¶¶ 10-20. The TSP is a SIGINT program of NSA specifically authorized by the President of the United States to fulfill a critical goal: to detect and prevent the next terrorist attack upon the United States and thereby avoid repeating the catastrophic loss of life and damage that resulted as a result of the attacks of September 11, 2001. See NSA Decl. ¶¶ 3-5. As the Court of Appeals has recognized, in the nation's ongoing global war on terror, "America faces an enemy just as real as its former Cold War foes, with capabilities beyond the capacity of the judiciary to explore."

Center for Nat'l Security Studies, 331 F.3d at 928.  Information that is compiled as a result of efforts to investigate and prevent terrorism is information collected "during the exercise of a quintessential executive power."  Id. at 935.  Such information cannot lightly be ordered disclosed.  See Bell v. United States, 563 F.2d 484, 487 (1st Cir. 1977) ("Whether disclosure of the end-product of cryptographic espionage used in time of war against an enemy power will or will not jeopardize the security of the cryptographic system itself is a judgment that a court simply should not, except perhaps in the most unusual circumstances, be called upon to make").

Here, NSA has identified the particular provisions of Executive Order 12958, as amended, under which the documents sought by plaintiff are classified and has articulated the various harms that would flow from the release of the information that plaintiff seeks in its requests numbered 1-4, 6-7, and 9-11.  Specifically, the information responsive to these requests meets the criteria for classification as set forth in Subparagraphs (c) and (g) of Section 1.4 of Executive Order 12958, as amended, which authorizes the classification of information concerning "intelligence activities (including special activities), intelligence sources or methods, or cryptology," and "vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection systems relating to national security, which includes defense against transnational terrorism."  See NSA Decl. ¶ 10.  Information responsive to these requests is classified TOP SECRET-SCI, see id., which means that its unauthorized disclosure "reasonably could be expected to cause exceptionally grave damage to the national security."  Executive Order 12958, as amended, § 1.2(a)(1); due to its special sensitivities, moreover, this information is further subject to special access and handling requirements that exceed those ordinarily accorded TOP SECRET information.  See NSA Decl. ¶¶ 4, 10 (describing the treatment of these materials as Sensitive Compartmented Information ("SCI"); note 4, supra; Exec. Order 12958, as

amended, 68 Fed. Reg. at 15326, § 4.3(a) (describing procedures by which classified information may be protected under special access programs when the normal restrictions for classified information "are not deemed sufficient to protect the information from unauthorized disclosure."

Thus, as described in the declarations provided by NSA, disclosure of the information requested in item 1 – which asks NSA for records relating to targets of surveillance under the TSP – would obviously and immediately affect the ability of NSA to fulfill the purpose of the TSP:  to detect and prevent the next terrorist attack against the United States.  NSA Decl. ¶ 11.

> To identify targets of the TSP is to offer official confirmation that such persons have been identified as, or linked to, a potential threat.  Such official confirmation is invaluable information to the enemy; its disclosure will alert the enemy that their operations may have been compromised and allow them to adopt strategies to circumvent surveillance and to otherwise evade detection, doing immeasurable damage to the national security of the United States.

Id.

Similarly, items 2-4, which seek, in various degrees, statistics relating to the operation of the TSP, would reveal information about NSA's success or lack of success in implementing the TSP.  Id. ¶ 12.  The disclosure of NSA's ability or lack of ability to access or intercept an individual's communications reveals "information about the U.S. intelligence community's capabilities, priorities, and activities."  Id.; see also id. ¶ 13 ("Targeted individuals know how they communicated, and as such, would know, upon NSA's confirmation or denial[,] which of their communications were vulnerable to NSA's electronic surveillance").  "The disclosure of this information could reasonably be expected to cause exceptionally grave damage to the national security because it gives the nation's adversaries information about the nature and frequency of the Government's use of specific techniques that could assist them in undermining NSA and the intelligence community's national security mission."  Id.; see ACLU I, 265 F. Supp. 2d at 31 ("records that indicate how [the agency] has apportioned its . . . resources, that reveal the

relative frequency with which particular surveillance tools are deployed, and that show how often

U.S. persons have been targeted may undoubtedly prove useful to those who are the actual or

potential targets of such surveillance, and may thereby undermine the efficiency and

effectiveness of such surveillance").

Because NSA's ability to produce foreign intelligence information depends upon its

access to foreign and international electronic communications, public disclosure of either the

capability to collect specific communications, the substance of the information derived from such

collection, or the frequency with which such information is collected "can easily alert targets to

the vulnerability of their communications."  See NSA Decl. ¶ 13; see also Giles Decl. ¶¶ 7-8.

Once alerted, SIGINT targets can "easily frustrate SIGINT collection."  Giles Decl. ¶ 7.  Thus,

"[i]f an individual learns or suspects that his signals are or may be targeted by the NSA for

collection, he can take steps to evade detection, to manipulate the information that NSA receives,

or to implement other countermeasures aimed at undermining NSA's operations."  NSA Decl. ?0

5; see also id. ¶ 13.  Such efforts to evade NSA monitoring would deny the United States access

to information crucial to "the defense of the United States both here and abroad."  NSA Decl.

¶ 13; see Ctr. for Nat'l Security Studies, 331 F.3d at 933 (upholding agency denial of request for

documents relating to dates and locations of arrest, detention, and release of terrorist suspects

after September 11, 2001, because disclosure of this information "would provide a complete

roadmap of the government's investigation. . . . Terrorists could learn from this information not

only where the government focused its investigation but how that investigation progressed step-

by-step.  Armed with that knowledge, they could then reach such conclusions as, for example,

which cells had been compromised . . . [or] be able to derive conclusions as to how more

adequately secure their clandestine operations in future terrorist undertakings").

Thus, disclosing the number of individuals subject to surveillance, whether since the inception of the program (plaintiff's item 2), or in a particularly identified time frame (item 3), or the total number of communications intercepted under the TSP (item 4), would "provide our adversaries with critical information about the capabilities and limitations of the NSA, such as the types of communications that may be susceptible to NSA detection." NSA Decl. ¶ 14. This information could be "exploited by our adversaries in order to conduct their international terrorist activities more securely, to the detriment of the national security of the United States." Id. In light of the exceptionally grave danger to national security that would reasonably be expected to result as a result of the unauthorized disclosure of information of this sort, NSA has determined that this information is currently and properly classified under the terms of Executive Order 12958, as amended. See id. Information responsive to plaintiff's items 1-4 therefore is properly withheld under Exemption One of FOIA.

The documents responsive to plaintiff's requests numbered 6 and 7 are similarly exempt. These requests seek "any and all documents relating to any audit or review of" the TSP (item no. 6) and "any and all documents that refer, reflect or relate to any concern, objection, or question raised within the NSA" about the TSP (item no. 7). See Giles Decl. Ex. 1. The documents identified as responsive to these requests reveal details about the operation of the TSP and its strengths and vulnerabilities. NSA Decl. ¶ 18. Public disclosure of this information would "have the effect of compromising the effectiveness of the program and undermining its goal of detecting and preventing the next terrorist attack on the United States." Id. ¶ 19. As NSA describes, any program designed to collect SIGINT, like the TSP, is fragile: if its methods or targets are revealed, adversaries of the United States can take steps to evade detection and monitoring. NSA Decl. ¶¶ 5, 13; see also Giles Decl. ¶¶ 7-8; Fitzgibbon, 911 F.2d at 763 ("the

procedure of monitoring international communications is one of the most simple intelligence

collection methods, but is superb utility stems from the sole fact that hostile powers do not know

which communications are seized and which channels are open to compromise"). In such cases,

the United States loses valuable intelligence that might be derived from such sources. Giles

Decl. ¶ 8; see also NSA Decl. ¶ 5 ("loss of accurate intelligence . . . in the case of the TSP, could

result in the catastrophic failure of the early warning system that the President has established to

detect and prevent the next terrorist attack"). Thus, these documents are properly classified

under Executive Order 12958, as amended, see NSA Decl. ¶ 19, and are exempt from disclosure.

NSA has also properly denied plaintiff's request for documents relating to checklists used

by the NSA or other intelligence and law enforcement agencies to determine "whether probable

cause or any justification exists for the initiation" of surveillance under the TSP (plaintiff's item

no. 7), see Giles Decl. Ex. 1:

> To disclose the criteria used to identify which individuals might be subject to
> monitoring by the United States essentially provides the enemy with a checklist of
> their own, which they can implement to evade monitoring, thus potentially
> depriving the NSA of the opportunity to collect information essential to the
> detection and prevention of the next terrorist attack.

NSA Decl. ¶ 17; see also Ctr. for Nat'l Security Studies, 331 F.3d at 928 (upholding agency's

denial of request for documents identifying terrorist suspects detained after September 11, 2001,

because disclosure could "allow terrorists to better evade the ongoing investigation and more

easily formulate or revise counter-efforts"). This information, accordingly, is currently and

properly classified, see NSA Decl. ¶ 17, and exempt from disclosure.

Concerns such as those articulated by NSA in this case have been found more than

sufficient to support summary judgment in other cases. For example, in Students Against

Genocide v. Dept. of State, 257 F.3d 828 (D.C. Cir. 2001), plaintiff challenged NSA's decision

to withhold most of a two-page document.  NSA explained that

> The information at issue identifies the targets whose communications have been
> exploited. To disclose any of this information would inform those targets of their
> vulnerabilities and of NSA's specific capabilities, sources and methods. If those
> targets learned or suspected that their communications were being successfully
> exploited, they would quickly act to engage countermeasures to deny access to
> those communications by changing their methods.

Id. at 840.  Weighing this evidence, the Court found that "[t]his justification for nondisclosure is

sufficiently specific, in light of the substantial weight owed to agency explanations in the context

of national security, to qualify for withholding under Exemptions 1 and 3."  Similarly in

Salisbury v. United States, the Court accepted NSA's description of the dangers that would stem

from the disclosure of "intelligence product derived from the intercept of foreign electromagnetic

transmissions" as sufficient to support summary judgment.  690 F.2d at 972-73.  Accord Hayden,

608 F.2d at 1388 (regarding as "inherently logical" NSA's contention that disclosing the

electromagnetic channels it monitors would impair its ability to collect intelligence information).

Indeed, as set forth in the accompanying declarations, disclosure of even the smallest

amount or most innocuous piece of information has the potential to provide the nation's

adversaries with information which, when pieced together with other information, can result in

the evasion of monitoring with disastrous consequences for U.S. national security.  See NSA

Decl. ¶ 20; Giles Decl. ¶ 4.  For this reason, courts have long recognized that "each individual

piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together

other bits of information even when the individual piece is not of obvious importance itself."

Gardels, 689 F.2d at 1106 (quoting Halperin, 629 F.2d at 150); accord Sims, 471 U.S. at 178.

"Thousands of bits and pieces of seemingly innocuous information can be analyzed and fitted

into place to reveal with startling clarity how the unseen whole must operate."  Halkin v. Helms,

598 F.2d 1, 8 (D.C. Cir. 1978).  As a result, "[w]hat may seem trivial to the uninformed, may

appear of great moment to one who has a broad view of the scene and may put the questioned

item of information in its proper context."  Salisbury, 690 F.2d at 971 (quoting United States v.

Marchetti, 466 F.2d 1309, 1318 (4th Cir. 1972)); see also American Civil Liberties Union v. U.S.

Dept. of Justice ("ACLU II"), 321 F. Supp. 2d 24, 37 (D.D.C. 2004) (Huvelle, J.) (discussing the

mosaic theory and concluding that, "[a]lthough the statistics to which plaintiffs seek access may

appear, on their face, to be innocuous, their disclosure would be harmful to national security").

As the Court of Appeals has recognized, the courts are not well-suited to judge these

effects: "[t]hings that did not make sense to the District Judge would make all too much sense to

a foreign counter intelligence specialist who could learn much about this nation's intelligence-

gathering capabilities from what these documents revealed about sources and methods."  Nat'l

Security Studies Center, 331 F.3d at 929 (quoting United States v. Yunis, 867 F.2d 617, 623

(D.C.  Cir. 1989)).  The same concerns animate NSA's withholdings here.  See Giles Decl. ¶ 4;

NSA Decl. ¶ 20.

In sum, the information sought by plaintiff is classified because its disclosure would

reasonably be expected to result in extremely grave danger to the national security of the United

States.  Those dangers have been described in detail by the declarations provided in support of

NSA's motion.  Because those declarations firmly establish that the information sought by

plaintiff is currently and properly classified, NSA is entitled to summary judgment on its

Exemption One claim.

### III.    NSA PROPERLY REFUSED TO CONFIRM OR DENY THE EXISTENCE OF DOCUMENTS RESPONSIVE TO PLAINTIFF'S REQUESTS NUMBERED 12, 13, AND 16.

Item 12 of plaintiff's request seeks "Any and all records relating to NSA's electronic

surveillance of Ohio trucker Iyman Faris, who was reported as having been a subject of the NSA

program and who was allegedly involved in a plot to destroy the Brooklyn Bridge, including

without limitation any checklist or approval of NSA's electronic surveillance of him. . . ."  Giles

Decl. Ex. 1.  Item 13 seeks "Any and all records related to a warrantless electronic wiretap

conducted under the NSA program that uncovered an alleged al Qaeda plot involving fertilizer

bomb attacks on British pubs and train stations, including without limitation any checklist or

approval of such electronic surveillance."  Id.  Item 16 seeks, as related to the TSP, "Any and all

NSA records relating to People for the American Way Foundation or People for the American

Way."  Id.  Each of these requests seeks information relating to the identity of particular alleged

targets of surveillance under the TSP.  NSA Decl. ¶ 25.

        NSA's refusal to confirm or deny plaintiff's requests for information related to particular

alleged targets of surveillance under the TSP is a proper response to a request for information of

this type.  An agency's decision to neither confirm nor deny the existence of responsive records

is commonly known as a "Glomar" response in reference to the subject of a FOIA request for

records pertaining to a ship, the "Hughes Glomar Explorer."  See Phillippi v. Central Intelligence

Agency, 546 F.2d 1009 (D.C. Cir.1976).  The invocation of the Glomar response is appropriate

when "to confirm or deny the existence of records . . . would cause harm cognizable under a

FOIA exemption."  Gardels, 689 F.2d at 1103.

        NSA's refusal to confirm or deny the existence of documents in response to requests

which seek information regarding whether particular persons are the target of surveillance under

the TSP is rooted in Exemptions One and Three.  Because of the highly classified nature of the

TSP, NSA cannot confirm publicly in any particular case whether any communications were

collected pursuant to the TSP or, conversely, that such communications were not collected:

        Confirmation by NSA that a person's activities are not of foreign intelligence
        interest or that NSA is unsuccessful in collecting foreign intelligence information

on their activities on a case-by-case basis would allow our adversaries to accumulate information and draw conclusions about NSA's technical capabilities, sources, and methods.  Our adversaries would have a road map, instructing them which communications modes and personnel remain safe or are successfully defeating NSA's capabilities.  For example, if NSA were to admit publicly in response to an information request that no information about Persons X, Y or Z exists, but in response to a separate information request about Person T state only that no response could be made, this would give rise to the inference that Person T is a target of the TSP.  Over time, the accumulation of these inferences would disclose the targets and capabilities (sources and methods) of the TSP and inform our adversaries of the degree to which NSA is aware of some of their operatives or can successfully exploit particular communications.

NSA Decl. ¶ 27.  As the NSA declarant explains, NSA cannot respond to each case in isolation, but must assume that the United States's adversaries will examine all released information together.  Id. ¶ 28.  Further, as described in detail above, the disclosure of information from which our adversaries can ascertain the capabilities of the NSA, the frequency with which it intercepts communications, or the types of targets it intercepts poses the danger that targets will adapt their behavior in an effort to evade detection.  See, e.g., NSA Decl. ¶¶ 5, 13, 20; see also Giles Decl. ¶ 7-8.  Thus, "[t]his compilation of information, if disclosed, could reasonably be expected to cause exceptionally grave and irreparable damage to the national security."  NSA Decl. ¶ 28; see also Gardels, 689 F.2d at 1104 (describing the dangers of accumulated information that might be provided in response to FOIA requests); Gordon v. Fed. Bureau of Investigation, 388 F. Supp. 2d 1028, 1037 (N.D. Cal. 2005) (same). Therefore, the fact of the existence or nonexistence of the information requested in items 12, 13, and 16 is a currently and properly classified matter in accordance with Executive Order 12958, as amended.  See, e.g. Marrera v. U.S. Dept. of Justice, 622 F .Supp. 51, 53 (D.D.C. 1985) (upholding, under Exemption One, agency decision refusing to confirm or deny whether particular individuals were the target of surveillance under a Foreign Intelligence Surveillance Court warrant).

The fact of the existence or nonexistence of these items is also protected from disclosure

by federal statute and, thus, properly withheld under Exemption Three.  Acknowledging the existence or nonexistence of the information requested in items 12, 13, and 16 would reveal NSA's organization, functions and activities by revealing the success or failure of NSA's activities.  NSA Decl. ¶ 29.  This information is protected from disclosure by Section 6 of the National Security Agency Act of 1959.  See p. 11, supra.  Disclosure would also reveal the sources and methods by which NSA collects foreign intelligence information.  NSA Decl. ¶ 29; see also NSA Decl. ¶¶ 10-20.  Revelation of this information is prohibited pursuant to Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004.  See pp. 11-12, supra.  Finally, this information would reveal the extent or limitations of NSA SIGINT capabilities.  NSA Decl. ¶ 29.  This revelation of communications intelligence capabilities and limitations is prohibited by 18 U.S.C. § 798.  See pp. 12-13, supra.  Thus, these disclosures are prohibited by statute, and NSA properly refused to confirm or deny the existence of the information plaintiff requested under FOIA Exemption Three.  See Gardels, 689 F.2d at 1104 (upholding, under Exemption Three, intelligence agency's refusal to confirm or deny the identity of persons with whom it had covert contacts).  As to requests 12, 13, and 16, accordingly, summary judgment should be granted to NSA.

## IV.    NSA CONDUCTED AN ADEQUATE SEARCH AND PROPERLY DETERMINED THAT IT HAD NO RECORDS RESPONSIVE TO PLAINTIFF'S REQUESTS NUMBERED 5, 14, AND 15.

As to plaintiff's requests numbered 5, 14, and 15, NSA has determined that it has no records responsive to these requests.  Because NSA conducted an adequate search and found no responsive records, it is entitled to summary judgment as to these requests.

To obtain summary judgment on the issue of the adequacy of the records search, an agency must show that "viewing the facts in the light most favorable to the requester, . . . [it] has

conducted a search reasonably calculated to uncover relevant documents." Steinberg v. Dept. of Justice, 23 F.3d 548, 552 (D.C. Cir.1994) (citing Weisberg v. Dept. of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984)) (internal quotes omitted). An agency must show that it made a "good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." Ogelsby v. U.S. Dept. of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990); accord Campbell, 164 F.3d at 27. An agency's search need not be exhaustive, merely reasonable. See Western Ctr. for Journalism v. Internal Revenue Serv., 116 F. Supp. 2d 1, 8 (D.D.C. 2000) (Kollar-Kotelly, J.) (citing Shaw v. Dept. of State, 559 F. Supp. 1053, 1057 (D.D.C. 1983)), aff'd, 22 Fed. Appx. 14 (D.C. Cir. 2001); see also Meeropol v. Meese, 790 F.2d 942, 952-53 (D.C. Cir. 1986) ("[i]t would be unreasonable to expect even the most exhaustive search to uncover every file"); Judicial Watch v. Rossotti, 285 F. Supp. 2d 17, 26 (D.D.C. 2003) (Collyer, J.) ("Perfection is not the standard by which the reasonableness of a FOIA search is measured.").

In establishing the guidelines under which a Court is to evaluate the adequacy of a FOIA search, the Court of Appeals has stressed that the process of conducting a "reasonable" search is a process that requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise" and is "hardly an area in which the courts should attempt to micro-manage the executive branch." Schrecker v. U.S. Dept. of Justice, 349 F.3d 657, 662 (D.C. Cir. 2003) (quoting Johnson v. Exec. Office for U.S. Attorneys, 310 F.3d 771, 776 (D.C. Cir. 2002)). Thus, there is no "bright-line set of steps for any agency to take" in searching in response to a FOIA request. Schrecker, 349 F.3d at 662; rather, "the adequacy of an agency's search is measured by a 'standard of reasonableness' and is dependent upon the circumstances." Id. (quoting Truitt v. Dept. of State, 897 F.2d 540, 542 (D.C. Cir. 1990)) (internal citation omitted).

In examining the adequacy of an agency's search, therefore, the Court must not address "whether there might exist additional documents possibly responsive to a request, but rather whether the search for those documents was adequate." Steinberg, 23 F.3d at 551 (citing Weisberg, 745 F.2d at 1485). In the absence of "countervailing evidence" or "substantial doubt," agency affidavits or declarations describing such a reasonable and adequate search are sufficient to demonstrate an agency's compliance with FOIA. See Iturralde v. Comptroller of Currency, 315 F.3d 311, 314 (D.C. Cir. 2003) (citations omitted).

NSA has conducted an appropriate search in this case. As the declaration of Mr. Giles recounts, NSA "conducted a search of all appropriate databases that would contain any records" responsive to plaintiff's requests numbered 5, 14, and 15, Giles Decl. ¶ 12, and identified no responsive records. Moreover, NSA also consulted with the TSP Program Manager, who is responsible for the execution of the TSP, to determine whether responsive records existed, and, again, located no responsive records. Id. These searches are adequate to satisfy NSA's burden in the absence of any countervailing evidence, see Iturralde, 315 F.3d at 314, and NSA is entitled to summary judgment as to these requests.

## V.    NSA PROPERLY REDACTED EXEMPT INFORMATION FROM THE RECORDS RELEASED IN RESPONSE TO PLAINTIFF'S REQUEST NUMBERED 8.

Plaintiff's item 8 seeks "communications with members of Congress about the TSP."[8]
On February 14, 2006, NSA released 106 pages responsive to this request, but redacted Agency employee names and information on other individuals. Giles Decl. ¶ 13. These redactions are

_____

[8] As described in the two NSA declarations, NSA maintains certain information concerning communications with members of Congress that is classified and subject to withholding for a variety of reasons. This information is responsive to Plaintiff's requests numbered 9 and 10, and thus its withholding is described in connection with NSA's response to those requests. See Giles Decl. ¶ 13 n.1.

wholly consistent with FOIA.

### A.    Redaction of NSA Employee Names.

NSA redacted Agency employee names from the documents produced in response to plaintiff's request pursuant to its authority under Section 6 of the National Security Agency Act of 1959, codified at 50 U.S.C. § 402 note, which, in pertinent part, provides that "nothing in the Act or any other law . . . shall be construed to require the disclosure of . . . the names, titles, salaries, or number of persons employed by" NSA.  Giles Decl. ¶ 13.

As fully described above, Section 6 of the National Security Agency Act qualifies as an Exemption Three statute under FOIA, see p. 11, supra, and the withholding of the "names . . . of persons employed by" NSA is clearly contemplated by that Section.  See Blazy v. Tenet, 979 F. Supp. 10, 25 (D.D.C. 1997) (upholding CIA redaction of names of employees under Exemption Three given Director of Central Intelligence's statutory duty to protect names of "personnel employed by" the CIA), aff'd, 1998 WL 315583 (D.C. Cir. 1998).  Thus, NSA properly redacted this information from the responsive documents produced to plaintiff under Exemption Three.

### B.    Redaction of Personal Information of Private Individuals.

NSA also redacted the names of private individuals, specifically, the names of constituents identified in correspondence from members of Congress, as well as those constituents' personal information such as addresses, Social Security numbers, telephone numbers, and passport numbers, under Exemption Six of FOIA.  Giles Decl. ¶ 14.  These redactions were proper under Exemption Six of FOIA.

Exemption Six allows an agency to withhold "personnel or medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Review of any agency's withholding under Exemption Six proceeds in "two

stages": first, the Court must decide whether the information is subject to protection under the Exemption; and second, the Court must determine whether disclosure would constitute a "clearly unwarranted invasion of personal privacy." Washington Post Co. v. U.S. Dept. of Health and Human Servs., 690 F.2d 252, 260 (D.C. Cir. 1982). With respect to the first stage, the threshold for the application of Exemption Six is "minimal." Id. The requirement of files "similar" to personnel or medical files has been read broadly to encompass any "information which applies to a particular individual." United States Dept. of State v. Washington Post Co., 456 U.S. 595, 602 (1982); accord New York Times Co. v. Nat'l Aeronautics & Space Admin., 920 F.2d 1002, 1006 (D.C. Cir. 1990) ("the threshold for application of Exemption 6 is crossed if the information merely 'applies to a particular individual'") (citation omitted).

Here, the information redacted by NSA was contained in correspondence files of NSA and consisted of the names of private individuals who sought information from Congress or from NSA regarding the TSP as well as other information relating to these individuals such as their addresses, Social Security numbers, telephone numbers, and passport numbers. Giles Decl. ¶ 14. This information easily clears the "minimal" threshold necessary to allow its protection under Exemption Six. Washington Post Co., 690 F.2d at 260.

In order to determine whether disclosure of information would constitute a clearly unwarranted invasion of personal privacy, the Court is required to "balance the public interest in disclosure against the privacy interests" of the individuals. Washington Post Co., 690 F.2d at 260. The "only public interest" to be considered under the FOIA is the extent to which disclosure "advances 'the citizens' right to be informed about what their government is up to.'" Hertzberg v. Veneman, 273 F. Supp. 2d 67, 87 (D.D.C. 2003) (quoting Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 34 (D.C. Cir. 2002) (in turn quoting United States Dept. of

Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 773 (1989)).  This purpose "is not fostered by disclosure of information about private citizens . . . that reveals little or nothing about an agency's own conduct."  Hertzberg, 273 F. Supp. 2d at 87 (quoting Reporters Comm. for Freedom of the Press, 489 U.S. at 773).

In this case, because the substantive content of unclassified "communications with members of Congress" sought by plaintiff were disclosed to plaintiff, as were the identities of the members of Congress with whom these communications occurred, NSA weighed the personal privacy interests involved and determined that release of personally identifying information concerning the private individuals who contacted Congress was clearly unwarranted.  Giles Decl. ¶ 14.   That determination was not in error.  See Hertzberg, 273 F. Supp. 2d at 87 (where substantive information that shed light on agency's actions was disclosed, disclosure of the personally identifying information of private individuals is "not compelled" under FOIA); see also Blazy, 979 F. Supp. at 24 (affirming CIA decision to redact names of private individuals contained in responsive documents where the "names of non-Agency personnel mentioned . . . do not shed light on the workings of the CIA").  Thus, NSA's redactions of the documents disclosed in response to plaintiff's request numbered 8 was proper under Exemption Six of FOIA.

## VI.    IN THE ALTERNATIVE, NSA PROPERLY WITHHELD MATERIAL RESPONSIVE TO PLAINTIFF'S REQUESTS NUMBERED 6, 7, AND 11 UNDER EXEMPTION FIVE.

Although information responsive to plaintiff's requests numbered 6, 7, and 11, as fully described above, are exempt from disclosure under Exemptions One, see supra pp. 19-27, and Three, see supra pp. 13-17, information located by NSA responsive to these three requests is also

subject to withholding pursuant to Exemption Five of FOIA.[9]  Exemption Five allows the agency

to withhold "inter-agency or intra-agency memorandums or letters which would not be available

by law to a party other than agency in litigation with the agency."  5 U.S.C. § 552(b)(5).

Exemption Five ensures that members of the public cannot "obtain through FOIA what they

could not ordinarily obtain through discovery undertaken in a lawsuit against the agency."

Schiller v. Nat'l Labor Relations Bd., 964 F.2d 1205, 1208 (D.C. Cir. 1992) (citation omitted).

As a result, Exemption Five "exempt[s] those documents . . . normally privileged in the civil

discovery context."  Id. (citations omitted)).

Of the ordinary litigation privileges available to NSA, the deliberative process privilege,

the attorney-client privilege, and the attorney-work product doctrine are applicable here.

See NSA Decl. ¶¶ 21-23.

###### A.    The Deliberative Process Privilege.

Documents covered by the deliberative process privilege include those "reflecting

advisory opinions, recommendations and deliberations comprising part of a process by which

government decisions and policies are formulated."  Nat'l Labor Relations Bd. v. Sears, Roebuck

& Co., 421 U.S. 132, 150 (1975) (citation omitted).  As the Supreme Court has explained:

> The deliberative process privilege rests on the obvious realization that officials
> will not communicate candidly among themselves if each remark is a potential
> item of discovery and front page news, and its object is to enhance the quality of
> agency decisions by protecting open and frank discussion among those who make
> them within the Government.

---

[9]  NSA asserts all of its FOIA exemptions at once as required by Maydak v. U.S. Dept. of
Justice, 218 F.3d 760 (D.C. Cir. 2000), cert. denied, 533 U.S. 950 (2001).  As the documents
here were withheld in full under other exemptions, providing significant detail regarding these
documents risks compromising the interests protected by those exemptions.  See, e.g., Campbell,
164 F.3d at 31; Linder, 94 F.3d at 697; Hayden, 608 F.2d at 1384-85 (all quoted supra at pp. 16).
NSA urges the Court, accordingly, to consider the withholding of these documents pursuant to
Exemptions One and Three in the first instance.

Dept. of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8-9 (2001) (internal

quotation marks and citations omitted).  FOIA's inclusion of the deliberative process privilege

among its exemptions "reflect[s] the legislative judgment that the quality of administrative

decision-making would be seriously undermined if agencies were forced to 'operate in a

fishbowl' because the full and frank exchange of ideas on legal or policy matters would be

impossible."  Tax Analysts v. Internal Revenue Serv., 117 F.3d 607, 617 (D.C. Cir.1997).

     An agency record must satisfy three conditions to qualify for the deliberative process

privilege.  It must be "inter-agency or intra-agency," 5 U.S.C. § 552(b)(5), that is, "its source

must be a Government agency," Klamath, 532 U.S. at 8; and it must be both "predecisional" and

"deliberative."  In re Sealed Case, 121 F.3d 729, 737 (D.C. Cir. 1997) (citations omitted).  "To

establish that a document is predecisional, the agency need not point to an agency final decision,

but merely establish what deliberative process is involved, and the role that the documents at

issue played in that process."  Judicial Watch v. Export-Import Bank, 108 F. Supp. 2d 19, 35

(D.D.C. 2000) (citation omitted).  A record is "deliberative" when "it reflects the give-and-take

of the consultative process."  Wolfe v. Department of Health and Human Servs., 839 F.2d 768,

774 (D.C. Cir. 1988) (citation and internal quotation marks omitted) (en banc).

     "There should be considerable deference to the [agency's] judgment as to what

constitutes . . . 'part of the agency give-and-take – of the deliberative process – by which the

decision itself is made.'"  Chemical Mfrs. Ass'n v. Consumer Prod. Safety Comm'n, 600 F.

Supp. 114, 118 (D.D.C. 1984) (Oberdorfer, J.) (quoting Vaughn v. Rosen, 523 F.2d 1136, 1144

(D.C. Cir. 1975)).  The agency is best situated "to know what confidentiality is needed 'to

prevent injury to the quality of agency decisions . . . .'"  Chemical Mfrs., 600 F. Supp. at 118

(quoting Nat'l Labor Relations Bd. , 421 U.S. at 151).

### B.    The Attorney-Client Privilege.

In general, the attorney-client privilege applies when a client communicates something to his or her lawyer with the intent that it remain confidential and for the purposes of securing "either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceedings." In re Lindsey, 158 F.3d 1263, 1270 (D.C. Cir. 1998) (citing In re Sealed Case, 737 F.2d 94, 98-99 (D.C. Cir. 1984)).  The privilege also encompasses any opinions given by an attorney to his client based upon facts communicated by the client.  See, e.g., Mead Data Central, Inc. v. U.S. Dep't of the Air Force, 566 F.2d 242, 254 n.25 (D.C. Cir. 1977).  In the FOIA context, the requirement that the attorney-client privilege involve confidential communications is satisfied if the communications suggest that "the government is dealing with its attorneys as would any private party seeking advice to protect personal interests."  Coastal States Gas Corp. v. Dept. of Energy, 617 F.2d 854, 863 (D.C. Cir. 1980).

### C.    The Attorney Work Product Doctrine.

The attorney-work product doctrine prevents the disclosure of  "documents prepared in anticipation of foreseeable litigation, even if no specific claim is contemplated."  Schiller, 964 F.2d at 1208.  It applies so long as "some articulable claim, likely to lead to litigation" has arisen. Coastal States, 617 F.2d at 865.  The doctrine, thus, protects information generated by legal counsel where "the document can fairly be said to have been prepared or obtained because of the prospect of litigation."  In re Sealed Case, 146 F.3d 881, 886 (D.C. Cir. 1998)

In particular, the work-product doctrine also shields activities designed to forestall or prevent litigation.  Thus, the Court of Appeals has noted:

> [i]t is often prior to the emergence of specific claims that lawyers are best equipped either to help clients avoid litigation or to strengthen available defenses should litigation occur. . . . If lawyers had to wait for specific claims to arise before their writings could enjoy work-product protection, they would not likely

risk taking notes about such matters or communicating in writing with colleagues,
thus severely limiting their ability to advise clients effectively. . . . Discouraging
lawyers from engaging in the writing, note-taking, and communications so critical
to effective legal thinking would . . . "demoraliz[e]" the legal profession, and "the
interests of the clients and the cause of justice would be poorly served."

In re Sealed Case, 146 F.3d at 886 (quoting Hickman v. Taylor, 329 U.S. 495, 511 (1947));

see also Cities Serv. Co. v. Fed. Trade Comm'n, 627 F. Supp. 827, 832 (D.D.C. 1984)

(documents which relate to "possible settlement discussions pertaining to foreseeable litigation

are protected under the attorney work-product privilege").

### D.    NSA Properly Withheld Documents Under Exemption Five.

Plaintiff's requests numbered 6, 7, and 11 seek, on their face, information about internal

deliberations, discussions, and communications. See Giles Decl. Ex. 1; NSA Decl. ¶ 22. This

information is part of a predecisional deliberative process, and/or attorney-client privileged

information, and/or attorney work product. Discussions about the performance, effectiveness,

and methods for improving, or otherwise modifying the TSP are "an integral part" of the

deliberative process. Id. Similarly, consultation with Agency attorneys regarding the parameters

of NSA's authority or other matters pertaining to the TSP fall within the attorney-client and

attorney-work product privilege. Id. The release of this information could chill the

decision-making process of Agency personnel.

As the NSA declarant explains, "the logic behind the deliberative process privilege is that

by maintaining the confidentiality of the give-and-take that occurs among agency members in the

formulation of policy, the deliberative process privilege encourages frank and open discussions

of ideas, and hence, improves the decision making process. This entire process would be harmed

if participants could no longer expect confidentiality when engaging in internal debates." NSA

Decl. ¶ 23. Similarly, the concerns that animate the attorney-client privilege and the attorney-

work product doctrine would be implicated by the release of documents that compromise those privileges.   Because information responsive to plaintiff's requests numbered 6, 7, and 11 falls within these categories, it is properly withheld pursuant to Exemption Five.

## CONCLUSION

For the reasons stated herein, NSA is entitled to summary judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General, Civil Division

KENNETH J. WAINSTEIN
United States Attorney

JOSEPH H. HUNT
Director, Federal Programs Branch

ELIZABETH J. SHAPIRO
Assistant Director, Federal Programs Branch

_____/s/ Rupa Bhattacharyya_____
RUPA BHATTACHARYYA (VA# 38877)
Senior Trial Counsel
Federal Programs Branch, Civil Division
United States Department of Justice
P.O. Box 883, 20 Massachusetts Ave., N.W.
Washington, D.C.  20044
Tel: (202) 514-3146
Fax: (202) 318-7593
Email: rupa.bhattacharyya@usdoj.gov

Dated:   May 9, 2006.