IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PEOPLE FOR THE AMERICAN WAY FOUNDATION, ) ) ) | |
| Plaintiff. ) ) | Civil No. 06-00206 (ESH) |
| v. ) ) NATIONAL SECURITY AGENCY/ ) CENTRAL SECURITY SERVICE, ) ) Defendant. ) ) | |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT AND OPPOSITION TO PLAINTIFF'S PARTIAL
MOTION FOR SUMMARY JUDGMENT**

In responding to the Motion for Summary Judgment (Docket No. 6) filed on behalf of defendant the National Security Agency ("NSA" or "Agency"), plaintiff has withdrawn the vast majority of its requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, see Pl's Opp. (Docket No. 12), at 1 (withdrawing requests numbered 1, 5, and 7-15), and has narrowed others, see id. at 4 (seeking, in lieu of "any and all documents" originally sought by requests 2-4, only certain statistics regarding the operation of the Terrorist Surveillance Program ("TSP")). Thus, only three issues remain to be decided on these cross-motions for summary judgment: (1) whether NSA properly withheld the statistics sought by plaintiff concerning the number of individuals targeted by the TSP and the number of communications intercepted by the TSP (plaintiff's alternative requests 2-4); (2) whether NSA properly withheld documents in response to plaintiff's request for "any audit or review of the NSA's program" (request 6); and (3) whether NSA properly refused to confirm or deny whether plaintiff is a target of surveillance under the TSP (request 16).[1]

---

[1] Plaintiff seeks summary judgment on its own behalf only as to the first of these issues.

As described below, NSA has demonstrated its entitlement to summary judgment on each contested issue in this case.

**I.  DEFENDANT PROPERLY WITHHELD INFORMATION RELATING TO TARGETS OF THE TSP AND THE FREQUENCY WITH WHICH COMMUNICATIONS ARE INTERCEPTED UNDER THE TSP.**

Plaintiff's partial motion for summary judgment with respect to its requests numbered 2-4 is premised on its conclusion that NSA has failed to demonstrate a basis for withholding certain statistics.  In particular, plaintiff seeks the total number of individuals targeted under the TSP since the inception of the program, the total number of individuals targeted under the TSP since March of 2004, and the total number of communications intercepted under the TSP since the inception of the program.  See Pl's Opp. at 8.  NSA has more than adequately demonstrated that the information sought by plaintiff – information that goes to the heart of the NSA's operation of the TSP – is information related to the "activities of the NSA," and, thus, is exempt from disclosure under Section 6 of the National Security Act of 1959, codified at 50 U.S.C. § 402 note, and Exemption Three of FOIA, 5 U.S.C. § 552(b)(3).  Moreover, NSA, through its declarants, has also identified the serious threat to national security that would be posed by the disclosure of this classified information, and thus has demonstrated its proper withholding under FOIA's Exemption One, 5 U.S.C. § 552(b)(1).  Because NSA's withholding of this information is not unlawful, NSA is entitled to summary judgment on plaintiff's requests 2-4, either in their stated or alternative form.

    **A.  NSA Has Properly Withheld the Requested Statistics Under FOIA Exemption Three.**

In arguing that NSA has failed to demonstrate why it cannot be compelled to disclose the requested statistics, plaintiff misunderstands the nature of the protection provided to NSA by Section 6 of the National Security Act of 1959, Pub. L. No. 86-36, 73 Stat. 63, 64, codified at 50

U.S.C. § 402 note.[2]  As explained in defendant's opening brief, "[t]he protection afforded by Section 6 is, by its very terms, absolute.  If a document is covered by Section 6, NSA is entitled to withhold it."  Linder v. National Security Agency, 94 F.3d 693, 698 (D.C. Cir. 1996).  Moreover, as the Court of Appeals has long recognized "[a] specific showing of potential harm to national security . . . is <u>irrelevant</u> to the language of [Section 6].  Congress has already, in enacting the statute, decided that disclosure of NSA activities is potentially harmful."  Hayden v. National Security Agency, 608 F.2d 1381, 1390 (D.C. Cir. 1979) (emphasis added).

Thus, it is "irrelevant" to NSA's claim of Exemption Three, whether, as plaintiff argues, "the total number of individuals and communications subject to the NSA's secret surveillance program over extended periods of time reveals nothing of the program's past or present techniques, vulnerabilities, capabilities, successes or failures," Pl's Opp. at 17, or if "it is implausible at best that the mere disclosure of these bare statistics – simply numbers – reasonably could be expected to result in damage to national security."  Id. at 11.  Even if these assertions were true – and as explained below, they are not – the "sole issue for decision" for the purpose of application of Section 6 is whether the information for which NSA claims the exemption falls "within the statute's coverage."  Fitzgibbon v. Central Intelligence Agency, 911 F.2d 755, 761 (D.C. Cir. 1990).

It cannot be seriously argued – and plaintiff does not appear to contend – that information as to how many persons NSA has targeted for interception under the TSP since the program's inception or in any other period and how many communications NSA has intercepted in those

---

[2] Section 6 provides "[N]othing in this Act or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, of any information with respect to the activities thereof, or of the names, titles, salaries, or number of persons employed by such agency."  50 U.S.C. § 402 note.

same time periods is not information concerning "the activities of the NSA," which is specifically protected from disclosure by the plain language of Section 6. See 50 U.S.C. § 402 note. To the contrary, as courts have repeatedly recognized, any information concerning the NSA's signals intelligence programs – and the TSP is one such program, see Declaration of Joseph B. ("NSA Decl."), attached as Ex. C to NSA's Motion for Summary Judgment, ¶ 4 – falls squarely within the terms of the statute. See Hayden, 608 F.2d at 1389 (upholding Exemption Three claims because "signals intelligence is one of [NSA's] primary functions" and the release of information concerning NSA's signals intelligence mission would "disclose information with respect to [NSA] activities, since any information about an intercepted communication concerns an NSA activity"); Larson v. Dept. of State, 2005 WL 3276303 (D.D.C. 2005) (upholding Exemption Three claim where "all of the material withheld . . . consists of information related to the activities, or core mission, of NSA, to wit: intelligence gathering based on electromagnetic signals"), appeal docketed as 06-5112 (D.C. Cir.); Florida Immigrant Advocacy Ctr. v. National Security Agency, 380 F. Supp. 2d 1332, 1333-34 (S.D. Fla. 2005) (upholding Exemption Three claims where "in its Affidavit, the Agency has shown specifically and clearly that the requested materials fall into the category of the exemption in that the one-page document concerned a specific NSA activity, to wit: intelligence reporting based on electromagnetic signals"). Thus, as these cases demonstrate, the inclusion of this information within the reach of the statute is reason alone to uphold NSA's determination to withhold it from release under FOIA. See Fitzgibbon, 911 F.2d at 761.[3]

---

[3] Plaintiff's repeated assertion that the statistics it requests do not concern intelligence "sources and methods" is nonsensical. See, e.g., Pl's Opp. at 14 ("PFAWF is not requesting information concerning 'procedures and methods' for intercepting communications'"); 15 ("PFAWF is not requesting information regarding intelligence 'sources and methods'"); 17 ("the total number of individuals and communications subject to the NSA's secret surveillance

Plaintiff's only response to this clear precedent is to argue that the plain language of Section 6 must give way to Congress's intent to enact protection for the NSA "consistent with legislation in effect with respect to other entities similarly situated in highly classified defense activities," see Pl's Opp. at 17, and that such intent requires disclosure of the information at issue here. Yet, first, as the Court of Appeals has noted, "[n]owhere in the legislative history of [Section 6] does Congress express any intent to limit the effect of the clear statutory language." Hayden, 608 F.2d at 1390. And, second, plaintiff points to no relevant example of similar information to which Congress does not extend analogous protection. Plaintiff argues that because Congress has required the disclosure of the number of warrants approved by the Foreign Intelligence Surveillance Court ("FISC") and because the Department of Justice has unilaterally determined to release certain information relating to the use of techniques authorized by Section 215 of the USA PATRIOT Act, that disclosure of the information at issue here is warranted. See Pl's Opp. at 11-12.

The three circumstances bear little in common. While Congress has required public

---

program . . . does [not] reveal any information about the NSA's sources and methods"). The TSP is a "method" of intelligence-gathering. The targets of the TSP are "sources" of intelligence. Plaintiff seeks information regarding the number of targets, i.e., sources, and the frequency which with the TSP, i.e., the method, is used. Because this information falls squarely within the language not only of Section 6, as described herein, but also within the plain terms of both Section 102A(i)(l) of the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638 (Dec. 17, 2004), codified at 50 U.S.C. § 403-1(i)(l), which protects "intelligence sources and methods," and 18 U.S.C. § 798, which prevents the disclosure of "classified information . . . concerning the communications intelligence activities of the United States," it is properly withheld under these two Exemption Three statutes as well. Plaintiff's "crabbed" reading of the protection afforded the federal intelligence agencies by these Acts of Congress was long ago rejected by the Supreme Court in Central Intelligence Agency v. Sims, 471 U.S. 159 (1985), and plaintiff offers no authority in support of it. See Fitzgibbon, 911 F.2d at 759, 764 (finding FOIA requester's arguments in favor of attempt to compel disclosure of information relating to intelligence sources and methods to be "vaporized by the unequivocal sweep of the Supreme Court's decision in Sims" and affirming district court's interpretation of Sims as refuting the Court of Appeals's earlier "crabbed reading")

reporting relating to certain FISC statistics, it has not required any similar public disclosure, even in the eight months since the TSP was publicly disclosed, with respect to the type of information sought by plaintiff here. Moreover, until the Attorney General made the unilateral determination that he would authorize disclosure of the number of times the Department had utilized certain techniques under Section 215 in a given year, this Court upheld the nondisclosure of that information. American Civil Liberties Union v. U.S. Dept. of Justice ("ACLU I"), 265 F. Supp. 2d 20, 30 (D.D.C. 2003) (Huvelle, J.). And, whether the issue is FISC warrants or Section 215 requests, those matters rest with the Department of Justice, which is not a "similarly secretive defense agency," see Hayden, 608 F.2d at 1390, and thus provide plaintiff no useful analogy.

To the contrary, when dealing with "similarly secretive defense agencies," such as, for example, the Central Intelligence Agency ("CIA"), the Courts have recognized the "sweeping," Central Intelligence Agency v. Sims, 471 U.S. 159, 169 (1985), and "wide-ranging," Snepp v. United States, 444 U.S. 507, 509 (1980), scope of their statutory exemption authority. In the words of this Court, the "sources and methods" exemption provided to the CIA is a "near blanket FOIA exemption," and is "only a short step [from] exempting all CIA records from FOIA." Whalen v. U.S. Marine Corps, 407 F. Supp. 2d 54, 59 n.5 (D.D.C. 2005) (Leon, J.) (quoting Minier v. Central Intelligence Agency, 88 F.3d 796, 801 (9th Cir. 1996)).

NSA's assertion of its Section 6 authority over the statistics plaintiff seeks is hardly inconsistent with this "sweeping" protection afforded to "other entities engaged in highly classified defense activities." Pl's Opp. at 17. Indeed, if anything, the Courts have recognized NSA's protections under Section 6 to be "broader" than those afforded the other intelligence agencies. See Hayden, 608 F.2d at 1390 ("In light of the peculiar NSA security needs . . ., Congress certainly had rational grounds to enact for the NSA a protective statute broader than the

CIA's."); see also Pl's Opp. at 15 (recognizing that Section 6 is the "broadest" of the three Exemption Three statutes invoked by NSA). Under these standards, NSA's determination to withhold the information sought by plaintiff is clearly justified.

Finally, plaintiff cites no case that would support its contention that this Court should disregard the plain terms of Section 6 and instead compel disclosure of the requested information. Plaintiff's only authority, cited on page 18 of its opposition brief, is the district court decision in Hayden. In that decision, however, the Court upheld NSA's withholding of the substantive information sought by the FOIA requester – consisting of all records pertaining to the requester – but required only the disclosure of the number of documents and pages withheld. Compare Hayden v. National Security Agency, 452 F. Supp. 247, 252 (D.D.C. 1978) (upholding NSA's assertion of Exemption 3) with id. at 253 (ordering disclosure of the number of documents and the number of pages included in each document), aff'd, 608 F.2d 1381 (D.C. Cir. 1979). Plaintiff does not seek information of the type ordered disclosed by the Hayden district court. To the contrary, plaintiff seeks disclosure of substantive information concerning the number of targets of the TSP and the frequency with which such targets' communications are intercepted, which is of the type the Hayden district court determined properly withheld.

The district court decision in Hayden, thus, if anything, supports NSA's determination to withhold the requested information from disclosure, and the Court of Appeals' decision affirming the district court, as discussed above, makes it clear that plaintiff cannot obtain summary judgment with respect to its request for statistics concerning the NSA's use of the TSP. See Hayden, 608 F.2d at 1389 ("we find the plain wording of the statute [i.e., Section 6] conclusive in the present case"). The information requested by plaintiff, accordingly, is properly withheld under Exemption Three as information concerning the "activities of the NSA," 50

U.S.C. § 402 note, and NSA is entitled to summary judgment on plaintiff's Complaint as to these FOIA requests.

> **B.    NSA Has Also Properly Withheld the Requested Statistics Under FOIA Exemption One.**

Defendant also properly withheld the information plaintiff seeks under Exemption One. As described in the declaration filed on behalf of the NSA, the disclosure of the number of targets of the TSP and the number of communications that have been intercepted under the program is information regarding the "frequency with which [] information is collected" that would be of great use to the enemy and could pose an exceptionally grave danger to the national security of the United States.  NSA Decl. ¶ 13; see also id. ¶¶ 5-6, 11-12, 14-15.  While plaintiff focuses on certain conclusions that might be drawn from the release of what plaintiff terms "simply numbers," see Pl's Opp. at 9, 11, plaintiff fails to recognize – indeed, has no expertise from which it could recognize – the serious damage that would be done to national security from identifying how many targets NSA has identified or how many communications NSA intercepts.

Plaintiff's naive assumption that "small totals could indicate either a high degree of precision or a lack of capability while large numbers could suggest either high levels of terrorist activity or NSA fishing expeditions," Pl's Opp. at 9, fails to account for the fact that the numbers alone are of great value regardless of whether they are relatively small or relatively large.  The distinction between two numbers that are both relatively small, for example, could be of great value to foreign terrorists.  Whether NSA is targeting 10 terrorists or 20, for example, would be of great value to someone who knows how many terrorist operatives are in place, and would disclose "information about NSA's success or lack of success in implementing the TSP." NSA Decl. ¶ 12.  Similarly, whether the NSA intercepts hundreds of communications or thousands is of great interest to those trying to judge the chances that their communications might fall within

NSA's interception capabilities.  See id. (describing the harm associated with disclosing "information about the nature and frequency of the Government's use of specific techniques"); id. ¶ 5 (describing harms that arise "if an individual learns or suspects that his signals are or may be targeted") (emphasis added).  These harms arise regardless of whether plaintiff believes that the exact numbers demonstrate that the NSA is operating "with a high degree of precision" or engaging in a "fishing expedition."  Pl's Opp. at 9.  Indeed, whether or not plaintiff believes that a certain number – whether it be 5, 500, or 5000 – is "small," "large," or otherwise depending on the lens through which plaintiff wishes to view the number, the fact of the matter is that plaintiff is in no position to judge whether the disclosure of the information it seeks would be harmful to national security.

      The NSA is in a position to make such a determination and it has made that determination.  As the NSA's declarant explains, the "disclosure of NSA's ability or lack of ability to access or monitor an individual's communications for interception reveals to that individual information about the U.S. intelligence community's capabilities, priorities and activities."  NSA Decl. ¶ 12.  Information about the "nature and frequency of the Government's use of specific techniques . . . could assist [individuals] in undermining the NSA and the intelligence community's national security mission."  Id.  It is, as the Court of Appeals has recognized, "inherently logical," see Hayden, 608 F.2d at 1388, that disclosure of the number of targets of a classified surveillance program or the number of communications that are intercepted would provide potential targets of that program with data that they could use to determine their likelihood of being intercepted.

      This conclusion is easily demonstrated by drawing an example from plaintiff's own assertedly innocuous requests.  Plaintiff seeks information about "the nature and frequency of the

Government's use of [a] specific technique," NSA Decl. ¶ 12, namely, the number of targets of the TSP and the number of communications intercepted. As explained, these pieces of information alone are of great value to the enemy and cannot be revealed. In combination, however, they prove even more dangerous. See NSA Decl. ¶ 20 ("Even the release of general information about the TSP poses the substantial risk that our adversaries will be able to piece together sensitive information about how the program operates"). Simple division of the two statistics requested yields yet a third "simple number," the average number of communications intercepted per target. With such information in hand, any potential target knows, at least on average, approximately how many times his communications are likely to be intercepted, information critical to his decisions about how, when, and where he will choose to communicate his terrorist plans. See NSA Decl. ¶ 5 ("if an individual learns or suspects that his signals are or may be targeted by the NSA for collection, he can take steps to evade detection, to manipulate the information that NSA receives, or to implement other countermeasures aimed at undermining NSA's operations") (emphasis added).

Courts have long recognized that sensitive information of this nature, if disclosed, when coupled with other available or unconfirmed information could provide further insight into the United States' intelligence strategies.[4] See Sims, 471 U.S. at 178 ("What may seem trivial to the

---

[4] Plaintiff's contention that "media reports based on unofficial leaks" purport to identify an approximate number of people subject to surveillance under the TSP has no effect whatsoever on the validity of NSA's exemption claims. See, e.g., Edmonds v. Dept. of Justice, 323 F. Supp. 2d 65, 76-77 (D.D.C. 2004) (Walton, J.) ("the fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods, and operations") (quoting Fitzgibbon, 911 F.2d at 766), aff'd, 161 Fed. Appx. 6 (D.C. Cir.), cert. denied, ___ U.S. ___, 126 S. Ct. 734 (2005); Edmonds v. Dept. of Justice, 272 F. Supp. 2d 35, 48-49 (D.D.C. 2003) (Huvelle, J.) ("since the statements in the press were made by anonymous sources, even documents containing identical information may properly be withheld [if] 'release would amount to official confirmation or acknowledgment of their accuracy'") (citation omitted).

uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context"); Ctr. for Nat'l Security Studies v. U.S. Dept. of Justice, 331 F.3d 918, 928 (D.C. Cir. 2003) ("things that did not make sense to the District Judge would make all too much sense to a foreign counter-intelligence specialist who could learn much about this nation's intelligence gathering capabilities from what these documents revealed about sources and methods"), cert. denied, 540 U.S. 1104 (2004); Fitzgibbon, 911 F.2d at 763 ("each individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance itself") (quoting Gardels v. Central Intelligence Agency, 689 F.2d 1100, 1106 (D.C. Cir. 1982), in turn, quoting Halperin v. Central Intelligence Agency, 629 F.2d 144, 150 (D.C. Cir. 1980)).

Thus, whether the TSP statistics plaintiff seeks are "small" or "large" according to plaintiff's value judgment is irrelevant – one terrorist in the right place with the right weapon can do as much harm as several thousand. To publicly disclose information that would cause these terrorists to take steps to avoid detection is reasonably likely to cause exceptionally grave damage to the national security of the United States. See NSA Decl. ¶¶ 5-6, 10-15; Declaration of Louis F. Giles ("Giles Decl."), attached as Ex. A to NSA's Motion for Summary Judgment, ¶¶ 7-8. Specifically, as the NSA has explained, disclosure of information about "the frequency with which . . . information is collected can easily alert targets to the vulnerability of their communications. . . . Once alerted, SIGINT targets can frustrate SIGINT collection . . . [which] may deny access to the target's communications and therefore deny access to information critical to the defense of the United States both here and abroad." NSA Decl. ¶ 13. Thus, "if an individual learns or suspects that his signals are or may be targeted by the NSA for collection, he

can take steps to evade detection, to manipulate the information that NSA receives, or to implement other countermeasures aimed at undermining NSA's operations." Id. ¶ 5 (emphasis added). The "resulting loss of accurate intelligence . . . deprives U.S. policymakers of information critical to U.S. interests, and in the case of the TSP, could result in the catastrophic failure of the early warning system that the President has established to detect and prevent the next terrorist attack." Id.

At bottom, plaintiff's argument that the disclosure of this information "could not reasonably be expected to result in damage to the national security," Pl's Opp. at 6, is nothing more than an effort by plaintiff to substitute its uninformed speculation for the expert judgment of the NSA in making these kinds of predictive assessments. Courts have repeatedly – and in strong terms – rejected such attempts and have made it clear that it is the Executive Branch – not FOIA requesters and not the Courts – that is charged with assessing the dangers to national security posed by the disclosure of requested information:

> Essentially, plaintiff invites the court to conclude that plaintiff is more knowledgeable than the [intelligence agency] about what disclosure of information would harm intelligence sources and methods. The court declines plaintiff's invitation. . . . The fact that plaintiff subjectively believes that releasing the requested . . . information would not compromise sources and methods of intelligence is of no moment. The [intelligence agency] is statutorily entrusted with making that decision, not the plaintiff.

Aftergood v. Central Intelligence Agency, 355 F. Supp. 2d 557, 563 (D.D.C. 2005) (Urbina, J.). Similarly, "the judiciary is in an extremely poor position to second-guess the executive's judgment in [the] area of national security." Ctr. for Nat'l Security Studies, 331 F.3d at 928; accord Halperin, 629 F.2d at 148 ("Judges . . . lack the expertise necessary to second-guess [] agency opinions in a typical national security FOIA case").

Instead, when evaluating an intelligence agency's Exemption One claim, the issue for the

Court is whether "on the whole record, the Agency's judgment objectively satisfies the test of reasonableness, good faith, specificity and plausibility in the field of foreign intelligence in which [the agency] is expert and has been given by Congress a special role." Gardels, 699 F.2d at 1105. This burden is "not especially onerous," ACLU I, 265 F. Supp. 2d at 29, and the NSA has met it here. As in the case of the aggregate statistics at issue in ACLU I, records such as those requested here "that . . . reveal the frequency with which particular surveillance tools have been deployed . . . may undoubtedly prove useful to those who are the actual or potential target of such surveillance, and may thereby undermine the efficiency and effectiveness of such surveillance. That the public has a significant and entirely legitimate desire for this information, does not, in an Exemption 1 case, alter the analysis." Id. at 31. Just as in ACLU I, therefore, summary judgment in defendant's favor is warranted.

## II. NSA PROPERLY WITHHELD DOCUMENTS RESPONSIVE TO PLAINTIFF'S REQUEST NUMBERED 6 IN FULL.

Plaintiff opposes NSA's motion for summary judgment with respect to its request numbered 6, "in particular with respect to documents reflecting outside determinations about the legality of the program." Pl's Opp. at 19. Indeed, the entirety of plaintiff's challenge to the NSA's withholding of documents responsive to its request numbered six under Exemptions One, Three and Five is focused on the possible existence of documents that reflect outside legal determinations regarding the program. See Pl's Opp. at 19-27. Plaintiff's focus here is curious because their request numbered 6 did not mention either legal determinations or legal opinions concerning NSA's authority to undertake the program, but rather sought operational information concerning "any audit or review of the NSA's program . . ., whether such audit or review was conducted internally by the NSA or externally, and whether such review or audit was conducted for the benefit of congressional or executive branch use." Pl's Opp., Ex. 1 at 2. NSA responded

to this request by identifying "audits/internal reviews" that concerned the "operation of the program, and providing recommendations and suggestions for the effective operation of the program," see NSA Decl. ¶ 18, but did not consider legal analysis of or legal opinions regarding the program responsive.  See Supplemental Declaration of Louis F. Giles ("Supp. Giles Decl."), attached hereto as Ex. A, ¶ 2.

It is, of course, no secret that NSA obtained such legal analysis and opinions.  As plaintiff recognizes, NSA Director General Michael Hayden has testified regarding the existence of such opinions, see Pl's Opp. at 20-21, and other government officials have similarly acknowledged that legal analysis of the TSP has been undertaken.[5]  But despite plaintiff's somewhat defensive assertion that their request "would logically include determinations about the legality of the secret surveillance program," Pl's Opp. at 20, plaintiff's request is not reasonably read to include such information.  If plaintiff had sought legal opinions about or analysis of the program, it need only have said so, as many other requesters did.  See Supp. Giles Decl. ¶ 3 & Attachment A thereto.  It did not.

Instead, plaintiff's requests seek various kinds of operational information, i.e., documents relating to the identity of targets (request 1); the number of targets (request 2); the number of individuals subject to surveillance since March 2004 (request 3); the total number of communications intercepted (request 4); wiretaps that failed to satisfy predetermined conditions established by policy, procedure, notice, directive, or practice (request 5), and so on.  In this context, NSA both reasonably interpreted plaintiff's request numbered 6 as seeking operational reviews and audits of the program and searched and reasonably responded accordingly.

---

[5] Nothing herein is intended to waive any privilege or exemption from disclosure that might be associated with such analysis or opinions.

-14-

See Supp. Giles Decl. ¶¶ 2-3; 5 U.S.C. § 552(a)(3)(A)(i) (requester has a duty to reasonably describe the records sought); Tax Analysts v. Internal Revenue Serv., 117 F.3d 607, 610 (D.C. Cir. 1997) (a request "reasonably describes" the records sought where "the agency is able to determine precisely what records are being requested"); see also Goland v. Central Intelligence Agency, 607 F.2d 339, 355 (D.C. Cir. 1978) (deferring to agency interpretation of request where the term used in plaintiff's request "admittedly is not a term whose meaning can be nicely cabined within bright lines; but it is the term plaintiffs used, and if any ambiguity was introduced thereby plaintiffs must reap what they have sown").

If plaintiff wishes to seek the disclosure of legal opinions or analysis regarding the TSP, it may file a new FOIA request to that effect. Plaintiff should not be permitted here, however, to seek as an afterthought more than it actually sought by suggesting that its request, which said nothing about legal analysis or opinions, now should be read to include such. Absent any challenge to the NSA's showing with respect to the documents it identified as responsive to plaintiff's request numbered 6 but withheld,[6] the NSA is entitled to summary judgment on this FOIA request.

### III. NSA PROPERLY REFUSED TO CONFIRM OR DENY WHETHER PLAINTIFF WAS SUBJECT TO SURVEILLANCE UNDER THE TSP IN RESPONSE TO PLAINTIFF'S REQUEST NUMBERED 16.

---

[6] The NSA declarant has specified that he has "reviewed the information" identified as responsive to plaintiff's request numbered 6 in his "capacity as an Original Classification Authority" and has determined that "the information responsive to plaintiff's request contained in these document is itself material that is currently and properly classified." NSA Decl. ¶ 20. Moreover, the declarant has attested that "such information is so intertwined with additional information regarding the details of operation of the program that it cannot be segregated and released without compromising the national security of the United States," id., and has determined that "no segregable portion of the responsive documents may be disclosed." Id. In the absence of any countervailing argument or evidence from plaintiff, such determinations are sufficient to warrant summary judgment for the NSA under FOIA.

Plaintiff challenges the NSA's "Glomar" response to its request for information as to whether NSA maintains records relating to the TSP concerning "People for the American Way Foundation or People for the American Way." More specifically, plaintiff challenges the NSA's refusal to confirm or deny whether it has records relating to it as an alleged target of surveillance under the TSP, claiming that NSA's approach is the functional equivalent of "killing an ant with a sledge hammer," and that "disclosure of whether it is wiretapping two entities out of millions could hardly 'let the cat out of the bag.'" Pl's Opp. at 30. Plaintiff's arguments once again demonstrate its complete lack of understanding of the treacherous environment in which the U.S. intelligence community operates and its naivety as to the dangers posed by compelling NSA to respond to requests like the one plaintiff poses.

As fully and clearly explained by the NSA's declarant, NSA cannot confirm or deny targeting information without jeopardizing its need to protect the identity of its targets:

> Confirmation by NSA that a person's activities are not of foreign intelligence interest or that NSA is unsuccessful in collecting foreign intelligence information on their activities on a case-by-case basis would allow our adversaries to accumulate information and draw conclusions about NSA's technical capabilities, sources, and methods. . . . For example, if NSA were to admit publicly in response to an information request that no information about persons X, Y or Z exists, but in response to a separate information request about Person T state only that no response could be made, this would give rise to the inference that Person T is a target of the TSP. Over time, the accumulation of these inferences would disclose the targets and capabilities (sources and methods) of the TSP and inform our adversaries of the degree to which NSA is aware of some of their operations or can successfully exploit particular communications.

NSA Decl. ¶ 27. As the NSA declarant explains, NSA cannot respond to each case in isolation, but must assume that the United States' adversaries will examine all released information together. Id. ¶ 28. The conclusions that could be drawn from these accumulated disclosures can be expected to have exceptionally grave consequences for the national security of the United States. See, e.g., NSA Decl. ¶ 5, 13, 20; see also Giles Decl. ¶¶ 7-8.

Although plaintiff complains that this approach is insufficiently "nuanced," Pl's Opp. at 30, courts have routinely accepted that, when discussing sensitive targeting information, federal agencies whose intelligence or law enforcement activities would be compromised by accumulated disclosures of the type described by the NSA's declarant have the right, and indeed, the responsibility, to make a "Glomar" response. For example, in Marrera v. U.S. Dept. of Justice, 622 F. Supp. 51, 53 (D.D.C. 1985), this Court upheld, under Exemption One, an agency decision to refuse to confirm or deny whether particular individuals were the subject of surveillance under a FISC warrant. Similarly, in Gordon v. Fed. Bureau of Investigation, 388 F. Supp. 2d 1028, 1037 (N.D. Cal. 2005), the court upheld the agency's refusal to confirm or deny whether particular individuals were on a terrorist watch list. And, in Gardels, 689 F.2d at 1104, the Court of Appeals upheld, under Exemption Three, the agency's refusal to confirm or deny the identity of persons with whom it had covert contacts. Plaintiff makes no effort to distinguish any of these cases.

Notwithstanding plaintiff's lament that confirming whether "two entities out of [] millions" are the target of NSA surveillance cannot pose a threat to national security, Pl's Opp. at 30, the fact is that in just the six-month period from January through June 2006, NSA received 835 requests from individuals and organizations seeking surveillance records on themselves.[7]

---

[7] Plaintiff's indignation with respect to the NSA's "Glomar" response is particularly ironic in light of the fact that plaintiff's website, www.pfaw.org, prominently displays a link on its "Constitutional Liberties" page entitled "Is the Government Spying on You?" which, when clicked, takes the curious to a page, www.foiarequest.org, characterized as "A Project of People for the American Way," which allows any individual to generate a FOIA request seeking information regarding government surveillance records as to the requester. Although this particular form apparently generates a request directed at the Federal Bureau of Investigation and not at the NSA, it goes without saying that similar Internet campaigns have generated hundreds of requests regarding surveillance under the TSP. In such circumstances, where plaintiff is not only clearly aware that more than the two entities it represents seek this information, but where it is actively engaged in soliciting such requests from the general public – an activity which it

Supp. Giles Decl. ¶ 4. If NSA were required to affirmatively or negatively respond to each of these hundreds of requests, its critically important surveillance strategies would hardly remain confidential. See, e.g., Bassiouni v. Central Intelligence Agency, 392 F.3d 244, 246 (7th Cir. 2004) (upholding CIA "Glomar" response because "[p]ainstaking analysis of the patterns reflected in the agency's holdings might reveal that the person named in the request is himself a source of information. That would not be worrisome if people could request information only about themselves. . . . But any member of the public may invoke the FOIA, and the agency must disregard the requester's identity."), cert. denied, ___ U.S. ___, 125 S. Ct. 2945 (2005). As courts have recognized, any information available to a FOIA requester is similarly available to "North Korea's secret police and Iran's counterintelligence service too." Id. These and "other hostile entities," id., including agents of al Qaeda and its affiliates, would no doubt be greatly interested in the opportunity to have NSA officially and publicly confirm or deny whether they are subjects of surveillance under the TSP.

Thus, "when a pattern of responses itself reveals classified information, the only way to keep secrets is to maintain silence uniformly." Bassiouni, 392 F.3d at 246. Indeed, as the Court of Appeals for the Seventh Circuit noted in Bassiouni, "[e]very appellate court to address the issue has held that the FOIA permits the [intelligence agencies] to make a 'Glomar response' when it fears that inferences from . . . selective disclosure could reveal classified sources or methods of obtaining foreign intelligence." Id. (citing Frugone v. Central Intelligence Agency, 169 F.3d 772 (D.C. Cir. 1999); Minier v. Central Intelligence Agency, 88 F.3d 796 (9th Cir. 1996)). The NSA has invoked this policy of uniform silence here for reasons it has more than

---

undisputedly has every right to perform – its lament in this litigation that NSA has improperly failed to disclose "whether it is wiretapping two entities out of [] millions" rings decidedly hollow.

adequately explained. As a result, it is entitled to summary judgment with respect to its "Glomar" response to plaintiff's request numbered 16.

## CONCLUSION

For the reasons stated herein and in the NSA's opening brief, NSA is entitled to summary judgment as to every contested issue in this case. Moreover, in light of plaintiff's withdrawal of its requests numbered 1, 5, and 7-15, NSA is entitled to summary judgment as to its response to those requests as well.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General, Civil Division

KENNETH J. WAINSTEIN
United States Attorney

JOSEPH H. HUNT
Director, Federal Programs Branch

ELIZABETH J. SHAPIRO
Assistant Director, Federal Programs Branch


____/s/ Rupa Bhattacharyya_____
RUPA BHATTACHARYYA (VA# 38877)
Senior Trial Counsel
Federal Programs Branch, Civil Division
United States Department of Justice
P.O. Box 883, 20 Massachusetts Ave., N.W.
Washington, D.C. 20044
Tel: (202) 514-3146
Fax: (202) 318-7593
Email: rupa.bhattacharyya@usdoj.gov

Dated: September 1, 2006.